UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JANE DOE 1002,

    Plaintiff,

CASE NO:

v.

DARREN K. INDYKE and RICHARD D. KAHN,
in their capacities as the executors of the
ESTATE OF JEFFREY EDWARD EPSTEIN,

    Defendants.

_____

**COMPLAINT**

BOIES SCHILLER FLEXNER LLP

Plaintiff Jane Doe 1002, by her attorneys Boies Schiller Flexner LLP, for her Complaint against Defendants, Darren K. Indyke and Richard D. Kahn in their capacities as the executors of the Estate of Jeffrey Edward Epstein ("Epstein"), avers upon personal knowledge as to her own acts and status and upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1. This suit arises out of Jeffrey Epstein's sexual abuse of Plaintiff.

2. Jane Doe 1002 was sexually trafficked by Epstein as part of Epstein's organized ring of procuring young women for sex. Jane Doe 1002, who was eighteen (18) years old, was recruited by a woman who told Jane Doe that she would be hired to provide a massage to a wealthy man. Jane Doe 1002 was a struggling ballerina in New York City at the time she was recruited. The masseuse position was not legitimate and instead resulted in Epstein engaging in horrific sexual abuse of Jane Doe 1002.

3. Epstein's trafficking scheme involved recruiting young females by making false promises and using his wealth, power, and threats to intimidate the females into submission to his demands. This same pattern was repeated numerous times with numerous young women.

4. As United States District Judge Kenneth Marra found, "From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls . . . at his mansion in Palm Beach Florida, and elsewhere in the United States and overseas. . . . In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. Epstein used paid employees to find and bring minor girls to him. Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others." *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1204 (S.D. Fla. 2019) (internal citations omitted).

5.      Epstein organized this sex trafficking network to obtain hundreds of young females for himself for sex, and also lent these females out to other powerful and wealthy individuals to be sexually abused.

6.      Epstein conspired with others and hired staff to maintain and keep secret this network of sexual abuse for years, which sprawled throughout Epstein's residences in New York, Florida, New Mexico, the United States Virgin Islands, and Paris.  Epstein's preference was to have three different young females a day for his sexual pleasure.

7.       Despite his significant criminal activity, in 2008 Epstein received a shockingly minimal charge, pleading guilty to a single Florida state law charge of procuring a minor for prostitution and a non-prosecution agreement (a "NPA") with the U.S. Attorney for the Southern District of Florida.  Unknown to the public and the victims at the time, Epstein's lawyers were pressuring the Government to commit to the NPA without informing the victims.  Epstein's multiple victims were kept in the dark and told to be "patient" while Epstein's lawyers worked to protect him and other potential co-conspirators from prosecution.  Epstein served one year in jail, but was afforded the privilege of being able to leave the jail to go to work for twelve hours per day, six days per week.

8.      The NPA allowed Epstein to escape proportionate punishment for his actions and to continue operating his sex trafficking enterprise with liberty.

9.      A few years later, Epstein flippantly referred to his sexual abuse of multiple minors, and the slap on the wrist he had received for it, in a 2011 interview with the New York Post: "Billionaire pervert Jeffrey Epstein is back in New York City – and making wisecracks about his just-ended jail stint for having sex with an underage girl. 'I am not a sexual predator, I'm an offender,' the financier told The Post yesterday. 'It's the difference between a murderer and a person who steals a bagel,' said Epstein."  Amber Sutherland, *Billionaire Jeffrey Epstein:  I'm a*

*Sex Offender Not a Predator*, N.Y. Post (Feb. 25, 2011), https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/.

10. In August 2018, just one year before his death, Epstein told a New York Times reporter "that criminalizing sex with teenage girls was a cultural aberration and that at times in history it was perfectly acceptable." James B. Stewart, *The Day Jeffrey Epstein Told Me He Had Dirt on Powerful People*, N.Y. Times (Aug. 12, 2019), https://www.nytimes.com/2019/08/12/business/jeffrey-epstein-interview.html.

11. When Plaintiff was 18 years old, Epstein added her to his long list of victims by committing sexual assault and battery against her. As such, Epstein is responsible for battery and intentional infliction of emotional distress pursuant to New York common law. The damage to Plaintiff has been severe and lasting.

12. This action has been timely filed pursuant to N.Y. C.P.L.R. § 215(8)(a), which provides that a plaintiff shall have at least one year from the termination of a criminal action against the same defendant to commence an action with respect to the event or occurrence from which the criminal action arose. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claims arise was terminated on August 29, 2019.

13. Any statute of limitations applicable to Plaintiff's claims, if any, is tolled due to the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims, including Plaintiff. Epstein's actions deprived Plaintiff of the opportunity to commence this lawsuit before his death. Until his death, Plaintiff feared that Epstein and his co-conspirators would harm her or her family, or ruin her life, if she came forward.

14. Defendants are equitably estopped from asserting a statute of limitations defense. Allowing Defendants to do so would be unjust. Epstein and his co-conspirators intimidated each of his victims into silence by threatening their lives and their livelihoods. They therefore prevented Plaintiff from commencing this lawsuit before his death. By using threats, along with his wealth and power, Epstein was able to escape punishment for his intolerable and brutal crimes against countless young women and underage girls for the duration of his life.

## PARTIES

15. Plaintiff Jane Doe 1002 is a citizen and resident of New York.

16. Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

17. Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

## JURISDICTION AND VENUE

18. Jeffrey Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at the time of his death. Jeffrey Epstein maintained a residence in the Southern District of New York. As the legal representatives of the Estate of Jeffrey E. Epstein, Darren K. Indyke and Richard D. Kahn are deemed citizens of the U.S. Virgin Islands.

19. The amount in controversy in this action exceeds the sum or value of $75,000.00 excluding interests and costs and is between citizens of different states. Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

20. Venue is proper in this Court as Epstein's sexual abuse of Plaintiff occurred in New York, New York, where he recruited her at the age of 18, physically molested her, and began grooming her for sex in his organized sex trafficking ring.

21.     Many of the events giving rise to these causes of action occurred in the Southern District of New York, where a substantial amount of Epstein's property is located. Thus, venue in this district is proper. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A.     Epstein's Sex Trafficking Enterprise**

22.     Jeffrey Epstein was widely renowned as a billionaire who used his vast connections to powerful individuals, and seemingly unlimited wealth and resources, to create a web of transcontinental sex trafficking that served himself, his co-conspirators, and some of the most powerful people in the world.

23.     Epstein owned multiple residences and frequently travelled between them, including at 9 East 71st Street, New York, New York 10021, where the illegal sexual crimes against Plaintiff occurred. Epstein conservatively valued his New York townhome at $55,931,000.00. Epstein conservatively valued his ranch at 49 Zorro Ranch Road, Stanley, New Mexico 87056, at $17,246,208.00. In addition, Epstein owned residences in the Virgin Islands, Florida, France, and even on his own island, Great St. James Island, where his transcontinental sex trafficking of hundreds of young females servicing him, his co-conspirators, and wealthy and powerful individuals around the world occurred.

24.     The allegations herein concern Epstein's tortious acts against Plaintiff while in New York, where Epstein was staying at his 71st Street mansion.

25.     At all times material to this cause of action, Jeffrey Epstein utilized his seemingly unlimited power, wealth, and resources, as well as his deep connections to powerful and politically connected individuals, to intimidate and manipulate his victims of sexual abuse.

6

26. Epstein and his co-conspirators had perfected a scheme for manipulation and abuse of young females. As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose. The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed. At times the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation. Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house. They would also strategically place photographs of very powerful political and social figures amongst photographs and art displaying nude females in an effort to normalize the sexual abuse. They would also normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur. Once abused, Epstein and his co-conspirators continued to manipulate the victims, using their financial power, promises, and threats to ensure that the victim returned as directed and remained compliant with their demands.

**B.     The Arrest, Prosecution, and Death of Epstein**

27. The sexual trafficking ring described herein started at least as early as 1995 and continued up until at least July 2, 2019, when the U.S. Attorney's Office for the Southern District of New York ("SDNY") charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591. He was arrested on July 8, 2019, pursuant to the SDNY's Sealed Two Count Indictment, which is attached as Exhibit A.

28. The Indictment described Epstein's conduct and his abuse and trafficking of females in the same trafficking operation he used to abuse and traffic Plaintiff.

29. Epstein's last will and testament (the "Will") was executed on August 8, 2019, at the Metropolitan Correctional Center. The witnesses were Mariel Colón Miró and Gulnora Tali. The Will included affidavits from Darren K. Indyke and Richard D. Kahn, in which they swear an "Oath of Willingness to Serve as Executor and Appointment of Local Counsel."

30. Epstein was found dead in his cell at the Metropolitan Correctional Center on August 10, 2019.

31. Epstein's last will and testament was filed on August 15, 2019, in the Probate Division of the Superior Court of the Virgin Islands.

32. Darren K. Indyke and Richard D. Kahn filed a Certificate of Trust in the Superior Court of the Virgin Islands for Epstein's 1953 Trust on August 26, 2019. *See* Certificate of Trust, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Aug. 26, 2019).

33. Epstein's will was entered into probate on September 6, 2019, and the Superior Court of the Virgin Islands accordingly authorized Darren K. Indyke and Richard D. Kahn to administer Epstein's estate. *See* Order for Probate, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019); Letters Testamentary, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019).

34. The Will's first article directs Epstein's executors "to pay from my estate all expenses of my last illness, my funeral and burial expenses, the administration expenses of my estate and all of my debts duly proven and allowed against my estate." The Will further directs that "after the

payments and distributions provided in Article FIRST," Epstein "give[s] all of my property, real and personal, wherever situated . . . to the then acting Trustees of The 1953 Trust."

35.     Following Epstein's death, SDNY submitted a proposed nolle prosequi order in the criminal matter against him because it was required by law to do so after Epstein was deceased. On August 29, 2019, U.S. District Judge Richard Berman formally dismissed SDNY's Indictment against Epstein, terminating the criminal action against him.  Plaintiff's claims are therefore timely under N.Y. C.P.L.R. § 215(8)(a).

**C.    Jane Doe 1002**

36.     In or around 2004, Jane Doe 1002 was 18 years old and was living in Manhattan.  She was an aspiring dancer.

37.     One night, a woman that Jane Doe 1002 knew approached Jane Doe 1002 and her friend and told them that they could provide a massage to a man and that he would pay them $300 dollars for the massage.  The woman described the job in a way that made it sound legitimate to Jane Doe 1002.

38.     Jane Doe 1002 and her friend agreed.  The woman provided Jane Doe 1002 and her friend with Lesley Groff's phone number, and they set up an appointment to give the man, who turned out to be Jeffrey Epstein, a massage at his New York mansion.

39.     When Jane Doe 1002 and her friend arrived at the mansion, they were greeted by a housekeeper who led them to a waiting area that looked like a library.  The girls were incredibly intimidated by the grandeur of the mansion and it was clear from everything they witnessed that Epstein was a very powerful man.   A woman then escorted them into a room with a massage table.

40.     Jane Doe 1002 and her friend gave Epstein a massage together while he was lying on his stomach, with one girl massaging his shoulders and the other girl massaging his feet. Epstein demanded that the girls take their clothes off. Epstein then turned over and started masturbating. The girls were terrified and were isolated in the dark room. Epstein then directed Jane Doe 1002 to leave the room to be alone with her friend. After the massage, Epstein paid Jane Doe 1002 three hundred dollars in cash.

41.     After that first meeting, Epstein's employees and associates—including Lesley Groff—began calling Jane Doe 1002 via telephone to arrange for her to return to the New York mansion for additional massages. Epstein demanded that Jane Doe 1002 and her friend come back to the mansion separately, rather than together. Jane Doe 1002 felt extremely threatened by Epstein and was terrified of what would happen to her if she failed to comply with Epstein's demands so she followed the directions of Epstein's employees and arrived at the mansion when directed to do so.

42.     Each time Jane Doe 1002 went to Epstein's mansion to give him a massage, he asked her to undress into just her bra and underwear. He always masturbated during the massages, committed sexual assault on Jane Doe 1002's body, including her breasts and other intimate parts of her body, and forced her to pinch his nipples. He or one of his assistants would pay her approximately $300–500 in cash. She recalls being contacted a number of times by Epstein's assistant, Lesley Groff, to come to the mansion.

43.     At some point after Jane Doe 1002 first met Epstein, her mother was diagnosed with a brain tumor. Because Epstein constantly asked Jane Doe 1002 personal questions, she told him about her mother's diagnosis. Epstein told Jane Doe 1002 that he was familiar with neurology, and asked her to bring in her mother's brain scans. Jane Doe 1002 did as Epstein asked, and she and Epstein looked at her mother's brain scans in his office. Epstein told Jane Doe 1002 that he knew the best

surgeons in New York, but that if Jane Doe 1002 wanted Epstein to help her mother, then she would have to recruit other girls for him. Jane Doe 1002 refused. Epstein continued to tell Jane Doe 1002 that her mother would not receive key care unless Jane Doe 1002 did exactly as Epstein demanded.

44. After Epstein knew about Jane Doe 1002's mother's illness, he became more aggressive with her, recognizing that she was particularly vulnerable. On one occasion, Epstein demanded that Jane Doe 1002 get completely naked, and take off her bra and underwear. He then grabbed Jane Doe 1002, used a vibrator on her vagina very forcefully causing great pain, and told her to "pretend" that she was enjoying it.

45. On another occasion, Epstein grabbed Jane Doe 1002 and pressed her breasts into his leg, and asked him to massage his legs in that position.

46. During and before the massages, Epstein asked Jane Doe 1002 questions about her career, what her goals were, and other personal questions. Knowing that Jane Doe 1002 was a ballerina, Epstein would brag about famous ballet dancers that he knew. He even told Jane Doe 1002 that he had a dance studio in the New York mansion, and that if she was good and complied with all of his demands, he would let he practice her ballet in the studio.

47. Jane Doe 1002 was abused by Epstein for approximately one year.

48. Epstein made very clear to Jane Doe 1002 that he was incredibly wealthy, powerful, and regularly in contact with world leaders.

49. During the massages, Epstein would talk about his connections to powerful people, and would often talk on the phone with those people in front of Jane Doe 1002. On one occasion, Epstein told Jane Doe 1002 that he was on the phone with Kevin Spacey. Epstein also told Jane

Doe 1002 that he had friends in high places, but he "knew how they liked to party" so they would never betray him.

50. Further, in his New York mansion Epstein had photographs displayed of significant political figures to ensure that Jane Doe 1002 knew that he had extensive connections.

51. Epstein was not to be disobeyed and he made clear by his words and actions that there would be consequences if Jane Doe 1002 did not comply with his demands. She knew that reporting what had happened to her while Epstein was alive would have had severe consequences with regards to her physical safety, her family, and her career. She knew that she could not come forward until Epstein was dead.

52. In 2008, the FBI showed up at Jane Doe 1002's home to speak with her about Epstein. Jane Doe 1002 was terrified to speak to them because she feared Epstein would hurt her if he found out she had spoken to the FBI. Jane Doe 1002 experienced incidents that made her believe that Epstein was following her and could harm her.

53. Jane Doe 1002 was deeply affected by the assault and she suffers severe emotional distress from an experience that has affected her for her entire life.

54. Epstein's sexual assault and battery of Jane Doe 1002 continues to cause her significant distress and harm.

**FIRST CAUSE OF ACTION**
**(Battery)**

55. Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–54 as if fully set forth herein.

56. Epstein intentionally committed battery by sexually assaulting Plaintiff when she was a young woman. As described above, Epstein intentionally touched intimate parts of Plaintiff's body in an offensive and sexual manner without her consent.

57. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's first cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

58. As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## SECOND CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

59. Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–54 as if fully set forth herein.

60. As a direct result of these allegations as stated, Epstein committed intentional infliction of emotional distress against Plaintiff.

61. Epstein's actions, described above, constitute extreme and outrageous conduct that shocks the conscience. Epstein's plan to recruit, entice, and assault Plaintiff goes beyond all possible bounds of decency and is intolerable in a civilized community.

62. Epstein knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

63. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's second cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

64. As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated:  August 26, 2020

/s/ Andrew Villacastin

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

Sigrid McCawley
(Pro Hac Vice Forthcoming)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

Joshua I. Schiller
Andrew Villacastin
Sabina Mariella
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300